**FRAGOMEN, DEL REY, BERNSEN, & LOEWY, LLP**

Carl W. Hampe (*pro hac vice* forthcoming)
K. Edward Raleigh (*pro hac vice* forthcoming)
Natalie M. Pate (*pro hac vice* forthcoming)
1101 15th Street, N.W., Ste. 700
Washington, DC 20005
Phone (202) 223-5515
Fax (202) 380 1095
CHampe@fragomen.com
KERaleigh@fragomen.com
NPate@fragomen.com

**R. MCCONNELL GROUP, PLLC**

Ryan D. McConnell (TX Bar 24051020)
Lawrence D. Finder (TX Bar 07007200)
Matthew S. Boyden (TX Bar 24113620)
2365 Rice Blvd., Suite 202
Houston, Texas 77005
Phone (713) 224-5775
ryan@rmcconnellgroup.com
larry@rmcconnellgroup.com
matthew@rmcconnellgroup.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
Houston Division

| | | |
|---|---|---|
| **Kiewit Offshore Services, Ltd.** | ) | |
| 2440 Kiewit Road | ) | |
| Ingleside, TX 78362 | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | Civil No. _____ |
| | ) | |
| **U.S. Department of Labor** | ) | |
| 200 Constitution Ave NW | ) | |
| Washington, DC 20210 | ) | |
| | ) | |
| **Martin J. Walsh**, Secretary | ) | |
| U.S. Department of Labor | ) | |
| 200 Constitution Ave NW | ) | |
| Washington, DC 20210 | ) | |
| | ) | |

| | |
|---|---|
| **Employment and Training Administration** | ) |
| U.S. Department of Labor | ) |
| 200 Constitution Ave NW | ) |
| Washington, DC 20210 | ) |
| | ) |
| **Brent Parton** | ) |
| Principal Deputy Assistant Secretary | ) |
| Employment and Training Administration | ) |
| U.S. Department of Labor | ) |
| 200 Constitution Ave NW | ) |
| Washington, DC 20210 | ) |
| | ) |
| *Defendants.* | ) |

---

COMPLAINT FOR DECLARATORY, MANDAMUS, AND INJUNCTIVE RELIEF

---

## **INTRODUCTION**

1.      This Matter concerns the erroneous denial of four applications for temporary labor certification that Plaintiff Kiewit Offshores Services, Ltd. ("Plaintiff") filed with Defendant U.S. Department of Labor ("Defendant DOL") covering hundreds of positions it has been unable to locate U.S. workers to fill.

2.      Plaintiff—one of the country's preeminent fabricators of oil and gas production facilities— has exceeded its capacity of U.S. workers in trying to staff three major projects for the construction of liquid natural gas ("LNG") production facilities in the Gulf of Mexico. These projects are of critical and urgent importance to the United States and the world at large, as the Russian invasion of Ukraine has wreaked havoc on global oil and natural gas supplies. Consequently, Plaintiff requires the services of temporary "H-2B" workers to help it meet the demand for its services the war created.

3.      However, Defendant DOL unlawfully denied the four applications for labor certification that would allow Plaintiff to request the H-2B visas it so urgently needs. Specifically, Defendant

DOL concluded that Plaintiff's need was not "temporary" as defined under the relevant regulations. That conclusion was contrary to clear statutory and regulatory language, hundreds of pages of evidence establishing the temporary "peakload" nature of Plaintiff's need, and Defendants' own conclusions in the context of a previous application for labor certification. Defendant DOL's conclusions lacked any basis in law or fact, and as such, Defendant DOL's denial violates the Immigration and National Act, 8 U.S.C. §§ 1101 *et seq.* ("INA") and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"). Plaintiff requests this Court set aside the unlawful denial and instruct Defendant DOL to follow applicable law, review all evidence in the administrative record, and approve the applications for temporary labor certification.

4.     Plaintiff is one of the top U.S.-based fabricators for the oil and gas industry, specializing in the construction of massive and complex steel structures used for the production of oil and gas, *e.g.,* oil rigs. Plaintiff operates out of facilities including, as relevant here, a facility in Ingleside, Texas.

5.     In 2021, Plaintiff received notices to proceed from New Fortress Energy ("NFE") for the construction, or rather conversion, of LNG production facilities from traditional oil rigs. Plaintiff is one of the only companies in North America with the expertise to accomplish this "one of a kind / never been done" project on the scale and in the timeline needed to respond to the current energy crisis.

6.     The Russian invasion of Ukraine in early 2022 has caused demand (and prices) for non-Russian natural gas to skyrocket as the United States and European Union looked to quickly cease the world's reliance on Russian supply in order to avoid feeding the Russian economy with money

that could be used to finance Russia's aggression against the Ukraine and reduce the price of natural gas in the global market.

7.      NFE's projects thus became critical, and it contracted Plaintiff for two additional projects to develop offshore production facilities that would enable fast delivery of LNG and help meet the unexpected spike in demand.

8.      As a result, Plaintiff had a great and urgent need to hire workers to staff these projects, but Plaintiff was unable to find sufficient U.S. workers to fill the positions it needed to meet the compressed project schedule.

9.      U.S. immigration law offers a ready mechanism to meet just such temporary spikes in labor demand—the H-2B program allows U.S. employers to bring noncitizen workers to the United States to fill temporary nonagricultural jobs for which it cannot find U.S. workers. *See generally* 8 U.S.C. § 1101(a)(15)(H)(ii)(b), 8 C.F.R. § 214.2(h)(6).

10.     The fundamental purpose of this visa classification is to help U.S. employers confront temporary shortages in U.S. labor that might arise under various circumstances, such as external short-term circumstances or the nature of the employer's work. *See* 73 Fed. Reg. 78104, 78114 (Dec. 19, 2008) ("The H-2B temporary nonimmigrant program often is a place of last resort for U.S. employers who cannot find sufficient U.S. workers.").

11.     While U.S. Citizenship and Immigration Services ("USCIS") has exclusive authority to ultimately grant H-2B classification, 8 U.S.C. § 1184(c)(1), it can only do so once the employer has obtained the necessary labor certification from Defendant DOL. *See* 8 C.F.R. § 214.2(h)(6)(iii)(C).

12.    To obtain a labor certification, Defendant DOL requires the employer show, among other things, that its need for H-2B workers is "temporary" in nature. *See id.* § 214.2(h)(6)(ii)(A); 20 C.F.R. § 655.6.

13.    On July 5, 2022, Plaintiff filed applications for H-2B labor certification with Defendant DOL for four positions it required for the NFE projects: (1) pipe fitters, (2) pipe welders, (3) structural fitters, and (4) structural welders ("Applications"). Those Applications, once granted, would cover H-2B filings for hundreds of individual workers. Plaintiff asserted that its need was temporary based on the "peakload" scenario contemplated by H-2B regulations. *See* 8 C.F.R. § 214.2(h)(6)(ii)(B)(3); 20 C.F.R. § 655.6(b).

14.    The "peakload" rationale requires the employer to demonstrate that it regularly employs permanent workers at the employment site but needs to supplement this labor due to a "seasonal or short-term" demand. 8 C.F.R. § 214.2(h)(6)(ii)(B)(3).

15.    Plaintiff included extensive evidence with each request showing that its need met this standard, explaining that a confluence of factors—namely, the war in Ukraine—had created an unanticipated, severe, and urgent spike in demand for natural gas production as the world market cut off its fuel supply from Russia, leading directly to two new projects for Plaintiff.

16.    However, Defendant DOL issued Notices of Deficiency ("NODs") for all four Applications. Most significantly, Defendant DOL said Plaintiff had failed to establish that its need for the positions was temporary in nature and requested further information.

17.    Plaintiff promptly responded to each Notice of Deficiency, submitting hundreds of pages of additional evidence responding to Defendant DOL's concerns. Plaintiff included payroll reports, past production numbers, project plans and schedules, histograms of demand, and employment timelines and projections for its permanent and temporary positions. Plaintiff explained the nature

and urgency of the NFE projects stemming from world events leading to the unanticipated constriction of natural gas supplies.

18.     Nevertheless, between August 29 and September 6, 2022, Defendant DOL issued four final determinations denying Plaintiff's Applications. Again, the denials concluded Plaintiff failed to establish that its need for the positions was temporary.

19.     Between September 2 and September 7, 2022, Plaintiff appealed the four denial decisions.

20.     On October 6, 2022, Defendant DOL issued a consolidated denial of all four appeals. In doing so, Defendant DOL introduced an incorrect new standard, reasoning that Plaintiff had not shown that the Ukraine war was the "but for" cause of its need for supplemental workers. In the analysis of its appeal decision, Defendant DOL only addressed temporariness, and it did not address any of the other three factors in the regulation governing Defendant DOL's review of the Applications. *See* 20 C.F.R. § 655.11(e).

21.     Defendant DOL's review of the data Plaintiff submitted was flawed. Defendant DOL's analysis apparently led it to conclude that Plaintiff's need for workers was too great to be considered temporary because its "peak" need period was too long and because Plaintiff already suffered from persistent permanent labor shortages. Such a conclusion ignored or misconstrued record evidence, disregarded explicit regulatory language, and wholly contradicted the underlying purpose of the H-2B program itself.

22.     Defendant DOL's decision further failed to address the fact that while the need for LNG will continue, Plaintiff's evidence showed that its fabrication duties are immediate and finite. Plaintiff's services are only needed to build the production facilities. After Plaintiff finishes its construction work, Plaintiff will no longer be needed, as NFE can continue producing LNG through the infrastructure Plaintiff constructs.

23.     Defendant DOL's decision also diverged from DOL precedent regarding Plaintiff and its "peakload" need in another similar context.

24.     Defendant DOL's denial decision thus ignored the overwhelming evidence in the record and demonstrated a lack of reasoned decision making.

25.     Where Defendant DOL did reference record evidence, it cherry-picked or misconstrued facts and the regulatory requirements.

26.     Plaintiff's Applications were approvable, and Defendant DOL had no basis for denying the applications. Defendant DOL failed to consider the whole administrative record, made factual and legal errors, and failed to reach a reasoned decision as required by the INA, the APA, and by relevant agency regulations and precedent.

27.     Defendant DOL's refusal to engage in a lawful review of Plaintiff's Applications constitutes agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

28.     Defendant DOL's disregard of relevant and probative record evidence resulted in its denial decision not being supported by substantial evidence.

29.     Plaintiff thus respectfully requests that this Court (i) set aside Defendant DOL's unlawful denial of the Applications, (ii) declare that Plaintiff is entitled to approval of the Applications, and (iii) order Defendant DOL to approve the Applications.

## PARTIES

30.     Plaintiff Kiewit Offshore Services, Ltd. ("Plaintiff") is one of the top U.S. based fabricators for the oil and gas industry specializing in massive and complex steel structures, including offshore liquid natural gas ("LNG") production facilities. Plaintiff operates principally out of its headquarters along Corpus Christi Bay in Ingleside, Texas.

31.     Defendant U.S. Department of Labor ("Defendant DOL") is a federal agency bearing relevant responsibility for the administration and enforcement of the nation's labor and employment laws. As relevant here, Defendant DOL administers the labor certification process that is required for various employment-based immigration benefits, including H-2B visas.

32.     Defendant Martin J. Walsh is sued in his capacity as the Secretary of Labor for Defendant DOL. In his capacity as Secretary of Labor, Defendant Walsh is charged with the supervision and management of all functions of Defendant DOL, including the Employment and Training Administration ("ETA"), which issues H-2B labor certifications.

33.     Defendant ETA is a bureau of Defendant DOL. Defendant ETA oversees the Office of Foreign Labor Certification ("OFLC"), which is responsible for approving or denying employers' applications for temporary employment certification under the H-2B program, including the Applications that are the subject of this suit.

34.     Defendant Brent Parton is sued in his official capacity as the Principal Deputy Assistant Secretary of Defendant ETA. In his capacity as Principal Deputy Assistant Secretary, Defendant Parton is charged with ensuring the proper processing of applications for temporary labor certifications, including the Applications that are the subject of this suit.

## JURISDICTION AND VENUE

35.     The Court has federal jurisdiction over this matter pursuant to 28 U.S.C. § 1331. *See Califano v. Sanders*, 430 U.S. 99, 105 (1977) (except where statutes preclude review, 28 U.S.C. § 1331 "confer[s] jurisdiction on federal courts to review agency action"). *See also,* 5 U.S.C. § 702; 28 U.S.C. § 1361; 28 U.S.C. §§ 2201–2202.

36.     Because Defendants' decision regarding an H-2B non-immigrant visa petition is not discretionary, neither the immigration laws (*see, e.g.*, 8 U.S.C. § 1252(a)(2)(B)(ii)) nor the APA

withdraws jurisdiction. *See, e.g., Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.,* 769 F.3d 1127, 1138 (D.C. Cir. 2014).

37.     The aid of the Court is invoked under 28 U.S.C. §§ 2201 and 2202, authorizing declaratory judgment.

38.     Venue properly lies in this judicial district under 28 U.S.C. § 1391(e)(1). Defendants are officers and agencies of the U.S. government. No real property is at issue in this Matter. Plaintiff maintains its headquarters in this district, and as such resides in this district for purposes of venue.

## FACTS

39.     Plaintiff is a U.S. corporation headquartered in Ingleside, Texas.

40.     Plaintiff is a subsidiary of Kiewit Energy Group Inc., a subsidiary of Kiewit Corporation ("Kiewit"). Kiewit is one of the largest employee-owned construction and engineering firms in North America, employing 12,500 core staff and another 14,500 skilled craft workers across its subsidiaries, including Plaintiff.

41.     Plaintiff specializes in manufacturing massive and complex steel structures used in oil and gas production, like oil rigs, and has delivered some of the largest offshore projects in the world.

42.     Plaintiff employs nearly two thousand U.S. workers in various trades tied to the fabrication industry, including in the four trades relevant to this case: (1) pipe fitters, (2) pipe welders, (3) structural fitters, and (4) structural welders.

43.     In 2021, a company called New Fortress Energy ("NFE") approached Plaintiff about constructing faster production facilities for LNG. NFE contracted Plaintiff to convert existing offshore oil rigs into LNG facilities, resulting in faster delivery of LNG to market.

44.    Based on Plaintiff's cutting-edge abilities as a steel fabricator, NFE verbally awarded this first project ("NFE Project 1") to Plaintiff in September 2021, with a Letter of Intent executed in October 2021. The companies agreed to a two-year time frame for delivery.

**The Russian Invasion of Ukraine Upends the Global Natural Gas Market**

45.    In February 2022, Russia invaded Ukraine, upending the LNG market on a global scale as world powers sought to quickly reduce energy imports from Russia.

46.    The United States and the European Commission formed a joint task force looking for ways to substitute sources of oil and gas, including through offshore natural gas facilities like the one that Plaintiff and NFE were already developing. Demand for non-Russian fuel sources skyrocketed.

47.    To help confront the demand crisis, NFE contracted with Plaintiff for two additional projects to perform similar work constructing LNG facilities ("NFE Projects 2 and 3").

48.    Plaintiff is uniquely situated to perform this work. Plaintiff is one of the few U.S. companies that can perform this type of work because of its expertise in oil rig structures as well as its physical facilities. Plaintiff operates out of its state-of-the-art, 550-acre facility off the Gulf Coast.

49.    If Plaintiff is unable to complete the NFE Projects, the work will almost certainly be outsourced to a company elsewhere because few or no other U.S. manufacturers could deliver these projects.

50.    The Russia-Ukraine war has made the NFE Projects critical on a national and global scale, as leaders in the United States and around the world rush to bring online every possible LNG project as quickly as possible. The timelines for turnaround have accordingly been pushed forward, with both NFE Project 2 and 3 having an 18-month turnaround time.

51.     There is also substantial overlap between the three Projects' timelines. NFE Project 1 and 2 overlap from September 2022 until April 2023, and all three Projects will overlap from January 2023 to April 2023.

52.     As a result of all of these factors, Plaintiff suddenly had an extreme need for any and all qualified workers available to staff the Projects.

53.     Plaintiff looked first to the U.S. labor pool, undertaking extensive efforts to recruit workers domestically. As widely reported, however, the U.S. labor market, and particularly the market for skilled craft labor, has been experiencing extreme shortages. See *Construction Industry Faces Workforce Shortage of 650,000 in 2022*, Association of Builders and Contractors (Feb. 23, 2023), available at https://www.abc.org/News-Media/News-Releases/entryid/19255/abc-construction-industry-faces-workforce-shortage-of-650-000-in-2022 ("The construction industry desperately needs qualified, skilled craft professionals to build America").

54.     Despite extensive U.S. recruitment efforts, Plaintiff has been wholly unable to meets its labor needs through U.S. workers—Plaintiff projected a crippling shortage of hundreds of skilled workers for the Projects unless it could fill the positions with foreign workers.

55.     Thus, Plaintiff turned to the H-2B program.

**The "H-2B" Temporary Non-Agricultural Worker Program**

56.     The H-2B program permits U.S. employers to bring noncitizen workers to the United States to fill "temporary" nonagricultural jobs "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

57.     The purpose of the program is to help U.S. employers that, due to swings in the labor market or the nature of their business, temporarily find it difficult to meet their labor needs within the U.S. workforce. *See* 73 Fed. Reg. 78104, 78114 (Dec. 19, 2008) ("The H-2B temporary

nonimmigrant program often is a place of last resort for U.S. employers who cannot find sufficient U.S. workers," despite the "additional burdens on the employer.").

58.     The authority for administering the H-2B program is spread across several federal agencies and requires a series of sequential filings and approvals from Defendant DOL, the U.S. Department of Homeland Security ("DHS"), and (typically) the U.S. Department of State.

59.     First, a prospective employer must secure temporary labor certification from DOL by submitting Form ETA-9141B, through which the employer certifies that, most relevantly, it has taken all necessary steps to fill the open positions with U.S. workers, and that it will not offer terms of employment to U.S. workers that is less favorable than that offered to the H-2B workers.

60.     A labor certification for a particular position allows that employer to fill multiple open positions for that same role and duration. 20 C.F.R. § 655.15(e) ("Certification of more than one position may be requested… as long as all H-2B workers will perform the same services or labor under the same terms and conditions…"). For example, one labor certification for a welder position could serve as the basis for hundreds of individual H-2B visas.

61.     Defendant DOL makes its determination "based on the following factors: (1) [t]he job classification and duties qualify as non-agricultural; (2) [t]he employer's need for the services or labor to be performed is temporary in nature, and for job contractors, demonstration of the job contractor's own seasonal need or one-time occurrence; (3) [t]he number of worker positions and period of need are justified; and (4) [t]he request represents a bona fide job opportunity." 20 C.F.R. § 655.11(e).

62.     Second, once Defendant DOL certifies the request for temporary employment certification, the employer files Form I-129, Petition for a Nonimmigrant Worker, with U.S. Citizenship and

Immigration Services ("USCIS"). USCIS, through the authority delegated to DHS, has ultimate authority to determine eligibility under applicable regulations. 8 U.S.C. § 1184(c)(1).

63.     Finally, following approval by USCIS, any H-2B outside the United States must secure a visa from the U.S. Department of State and be admitted to the United States by U.S. Customs and Border Protection.

64.     The agencies' determinations largely center around the meaning of "temporary."

65.     However, the regulations clarify that it is the employer's *need* that must qualify as "temporary," rather than the requested *job*. *See* 8 C.F.R. § 214.2(h)(6)(A) (defining "temporary services or labor" as "any job in which the petitioner's *need* for the duties to be performed by the employee(s) is temporary, *whether or not the underlying job can be described as permanent or temporary*.") (emphasis added). *See also* 20 C.F.R. § 655.6(a) ("An employer seeking certification under this subpart must establish that its *need* for non-agricultural services or labor is temporary, *regardless of whether the underlying job is permanent or temporary*.") (emphasis added).

66.     Both DHS and DOL regulations provide guidance on the meaning of "temporary need," albeit with varying degrees of specificity.

67.     DHS regulations require a sponsoring employer to establish that its need for noncitizen workers is "for a limited period of time" and will end in the "near, definable future." 8 C.F.R. § 214.2(h)(6)(ii)(B).

68.     DHS does not provide a strict definition for what constitutes "limited," "near", "or "definable," but rather sets general guideposts for lengths of time it would normally consider to be "temporary." According to DHS, "[g]enerally, that period of time will be limited to one year or less, but in the case of a one-time event could last up to 3 years." *Id*.

69.     DHS regulations then set out four different categories of temporary need under which an employer's need must fall to be considered temporary: "a one-time occurrence, a seasonal need, a peakload need, or an intermittent need." *Id.*

70.     Most relevant here is the "peakload" need. To qualify as a "peakload" need, the employer "must establish that it regularly employs permanent workers to perform the services or labor at the place of employment and that it needs to supplement its permanent staff at the place of employment on a temporary basis due to a seasonal or short-term demand and that the temporary additions to staff will not become a part of the petitioner's regular operation." *Id.* § 214.2(h)(6)(ii)(B)(3).

71.     DOL regulations in large part echo DHS's regulations. *See generally* 20 C.F.R. § 655.6 (defining "temporary need").

72.     DOL's regulations also restate the four types of temporary need but add that applications where the employer has a need lasting more than nine months will be denied "[e]xcept where the employer's need is based on a one-time occurrence." *Id.* § 655.6(b).

73.     The continued validity of DOL's separate nine-month regulatory period has been heavily contested. Congress has previously overruled that portion of DOL's regulations through appropriations such that the nine-month "bright line" cannot be lawfully applied. *See* Consolidated Appropriations Act of 2016, Division H, Title I, Pub. L. No. 114-113, 129 STAT 2242, 2599 (2015).

74.     DOL regulations also state that the ultimate authority to make the final determination as to whether an employer's need is temporary in nature rests with DHS. *See* 20 C.F.R. § 655.6(d).

75.     Critically, however, DOL's interpretation functionally controls because an employer cannot file an H-2B petition without DOL's certification. 8 C.F.R. § 214.2(h)(6)(iii)(C).

**Plaintiff Seeks Temporary Labor Certifications from DOL**

76.     On July 5, 2022, Plaintiff filed applications for temporary labor certification for four positions it required to staff the NFE Projects, covering hundreds of individual workers: 150 structural fitters, 50 pipe welders, 125 structural welders, and 125 pipe fitters ("Applications").

77.     Plaintiff did not seek to use the H-2B program to address the persistent lack of qualified and available U.S. workers due to broader labor market trends.

78.     Rather, Plaintiff based these requests on its upcoming "peakload" needs, *i.e.* a short-term spike in demand required Plaintiff to supplement its permanent workforce with temporary workers.

79.     Based on the complex overlapping schedule of the three Projects, Plaintiff projected its nine-month "peak" period to fall from October 1, 2022, to July 1, 2023.

80.     Plaintiff included ample evidence with the Applications to meet the relevant regulatory and statutory criteria to obtain the requested labor certifications.

81.     Plaintiff filed a letter with each Application explaining the basis of the need and enclosing evidence regarding the Projects and the confluence of need that arose as a result of the Russia-Ukraine conflict and the unexpected addition of Projects 2 and 3 to its already-busy project docket.

82.     Plaintiff also included evidence regarding its current workforce in each position, and evidence that H-2B workers it had previously used did not become permanent employees.

83.     In total, each Application included 90 or more pages of arguments and evidence relating to the position.

84.     On information and belief, the Applications were approvable as filed.

**Defendants Erroneously Deny Plaintiffs' Applications**

85.     Nevertheless, from July 11 to July 19, 2022, Defendant DOL issued a Notice of Deficiency ("NOD") regarding each of the four Applications.

86. The NODs mostly said Plaintiff had not submitted sufficient evidence to demonstrate that its need for the positions was temporary in nature. The NODs somewhat questioned the basis for the numbers of needed workers. Finally, some of the NODs requested information regarding Plaintiff's foreign recruitment efforts and various other matters.

87. From July 21 to July 27, 2022, Plaintiff filed responses to the NODs. With each response, Plaintiff provided hundreds of pages of additional information, including payroll reports, past production numbers, project plans and schedules, histograms of demand for labor, and employment timelines and projections for its permanent and temporary positions.

88. With respect to the crisis in Ukraine, Plaintiff submitted additional evidence showing the widely reported issues with natural gas demand and the efforts taken by the United States and other countries to confront these issues. Plaintiff explained how this crisis led directly to the creation of two additional projects to its pre-existing busy work docket.

89. On information and belief, that evidence was more than sufficient to carry Plaintiff's burden and should have compelled Defendant DOL's approval of the Applications.

90. Instead, from August 29 to September 6, 2022, Defendant DOL issued final determinations denying the Applications. Defendant DOL based the denials on its conclusion that Plaintiff's need for all four positions was not temporary in nature. 20 C.F.R. § 655.11(e)(2).

91. The final determinations did not, however, find that Plaintiff failed to show the first and fourth regulatory factors, *i.e.*, that "[t]he job classification and duties qualify as non-agricultural," and "[t]he request represents a bona fide job opportunity." 20 C.F.R. §§ 655.11(e)(1), (4). As to only the pipe fitters, Defendant DOL maintained that Plaintiff failed to establish the need for the specific number of workers that it sought. 20 C.F.R. § 655.11(e)(3).

92.     From September 2 to September 7, 2022, Plaintiff submitted administrative appeal filings with Defendant DOL's Board of Alien Labor Certification Appeals ("BALCA"). See *In re Kiewit Offshore Servs., Ltd.*, BALCA Case Nos. 2022-TLN-00140-142, 149, at 14 (Oct. 6, 2022), attached as Exhibit A.

93.     On October 6, 2022, Defendant DOL issued a consolidated denial of all four appeals.

94.     In the appeal decision, Defendant DOL did not discuss whether Plaintiff established the first, third, or fourth factor of DOL's H-2B requirements, *i.e.*, whether: "(1) [t]he job classification and duties qualify as non-agricultural; … (3) [t]he number of worker positions and period of need are justified; and (4) [t]he request represents a bona fide job opportunity." 20 C.F.R. § 655.11(e)(1), (3), (4).

95.     Defendant DOL maintained only that Plaintiff failed to demonstrate temporary "peakload" need. *See* 20 C.F.R. § 655.11(e)(2), § 655.6.

96.     Despite overwhelming record evidence demonstrating Plaintiff's temporary "peakload" need for H-2B workers based on the labor demand created by the Russia-Ukraine war, Defendant DOL upheld the denial decision's conclusion that the information provided somehow failed to meet the requirements of 8 C.F.R. § 214.2(h)(6)(ii) and 20 C.F.R. § 655.6 for establishing "temporary need."

97.     Defendant DOL thus—for a second time—made critical factual and legal errors and disregarded the information provided by Plaintiff.

98.     First, Defendant DOL seems to have unexpectedly applied a new standard, stating "[a]lthough the war in Ukraine is causing higher demand for liquified natural gas, [Plaintiff] has not shown that, but for the war, it would not have a need for supplemental workers."

99.     Defendant DOL has been committing the legal error of contending that the Russia-Ukraine war must be the "but for cause" of Plaintiff's need. However, there is no mention of a "but for cause" standard in the regulatory requirements regarding "peakload," nor is there supportive caselaw that is backed by legal authority. Rather, as the regulations clearly state, there must simply exist "a seasonal or short-term demand" that necessitates supplementing the employer's existing permanent workforce. 8 C.F.R. § 214.2(h)(6)(ii)(B)(3).

100.     Nor did Defendant's denial decision point to a rule or policy to support its novel "but for" interpretation. Defendant DOL has no lawful basis for imposing a requirement of but for causation under relevant law.

101.     In any case, the government and Defendant DOL cannot highlight the natural gas situation as a major crisis on the one hand, but with the other say that demand for services tied to that industry remain unaffected.

102.     Second, Defendant DOL conducted a flawed analysis of the data and concluded that Plaintiff's evidence did not demonstrate that its need for foreign workers was temporary under the regulations.

103.     In reaching this conclusion, Defendant DOL cherry-picked, misconstrued, or simply ignored record evidence.

104.     Plaintiff's Applications and corresponding evidence showed that the Ukraine crisis drove up demand for LNG. It established that there is an immediate need to fabricate new facilities to produce additional LNG. But while the need for LNG will continue, Plaintiff's evidence showed that its fabrication duties are immediate and finite—once built, its construction activities will no longer be needed, and NFE can continue producing LNG through the infrastructure Plaintiff constructs. Defendant DOL wholly failed to address this key evidence.

105.    Defendant DOL also ignored Plaintiff's evidence demonstrating that it has received H-2B visas in the past and did not continue to employ those individuals past the stated "peakload" period.

106.    Defendant DOL misconstrued the evidence it *did* review. Defendant DOL committed a basic logical error in its review. In Defendant DOL's view, because Plaintiff's overall need for workers is too *great*, its need cannot possibly be *temporary* in nature. But these terms are not antonymous.

107.    For example, Defendant DOL premised its denial decision on its erroneous application of a nine-month limit on Plaintiff's peakload application. DOL cannot lawfully impose its nine-month views, as Congress has strictly forbidden it from doing so.

108.    Even so, Defendant DOL's reading of the regulations twists both logic and the law. While sometimes a real-world peak might result in certain positions being available for 10 or 11 months, that does not mean that the employer's peakload need does not exist for the period requested. Rather, this means that an H-2B worker will simply be limited to the permitted nine months. Indeed, under DOL caselaw, Plaintiff could theoretically submit another round of H-2Bs if needed to cover any periods after this nine-month peak. *See*, *e.g.*, *In re Plant Process Equip., Inc.* (USDOL Administrative Review Board, 2020) ("[I]t would be permissible for Congress to bar successive, year-after-year, certifications for 'temporary' workers, but Congress plainly has not done so against the backdrop of the H program regulations allowing successive peakload or seasonal applications.").

109.    Nor can Defendant DOL punish Plaintiff for persistent U.S. labor shortages that have resulted in gaps between demand and supply.

110.    Defendant DOL concludes that Plaintiff's chronic labor shortages are evidence that Plaintiff's need for foreign workers is not temporary because its worker shortage persists beyond

the requested "peakload" period. But the two are not difficult to square—Plaintiff certainly can't find enough U.S. workers before and after this project, but *especially* during the overlapping peak identified here, that shortage is particularly dire.

111.    Indeed, Defendant DOL's logic here flies in the face of the relevant regulatory language as well as the entire underlying purpose of the H-2B program itself.

112.    DHS regulations define "temporary services or labor" as "any job in which the petitioner's need for the duties to be performed by the employee(s) is temporary, whether or not the underlying job can be described as permanent or temporary." 8 C.F.R. § 214.2(h)(6)(ii)(A).

113.    Even Defendant DOL's own regulations reiterate this principle. *See* 20 C.F.R. § 655.6(a) ("An employer seeking certification under this subpart must establish that its need for non-agricultural services or labor is temporary, *regardless of whether the underlying job is permanent or temporary*.") (emphasis added).

114.    In the 2008 preamble to the revision of the H-2B regulations, Defendant DOL recognized that the key was temporary need for the additional workers, not a constant shortage of supply. *See* 73 Fed. Reg. 78025. Defendant DOL referenced the relevant DHS regulation that provides describes a "peakload" need in terms of the demand for and not the supply of workers: "a peakload need, in which the employer needs to supplement its permanent staff on a temporary basis due to a short-term demand." 8 C.F.R. § 214.2(h)(6)(ii)(B).

115.    Thus, the H-2B provisions explicitly contemplate situations in which employers would be searching for temporary workers to fill positions that are normally permanent, exactly the situation in cases of structural labor shortages where nonetheless a peakload need has emerged—as Plaintiff is experiencing here.

116.    Defendant DOL's decision conflates short-term demand with long-term supply challenges. A tight supply curve does not prevent short-term spikes (peaks) in demand, which is what is happening to Plaintiff now. Plaintiff is facing one of the tightest labor markets for these workers in recent history and has been for some time. That fact does not change that Plaintiff's demand for these workers is heightened today due to the pressure to complete the NFE Projects now.

117.    The regulations likewise do not require Plaintiff to fill every open position with foreign labor, and indeed Plaintiff is exactly complying with the program by requesting only those positions for which a temporary worker would relieve its peakload need.

118.    Even if the regulations had *not* contemplated such a scenario, Defendant DOL's position would undermine the very purpose of the H-2B program.

119.    Just because skilled craftsmen are in constant high demand during a tight labor market, like today, does not mean that the need of these skills does not have peaks and valleys within that greater demand. Defendant DOL's position to the contrary ignores that the premise of the temporary worker provisions is designed to alleviate pressures during tight labor markets, at which points the U.S. worker has maximum leverage and is least likely to be adversely affected by the entry of temporary foreign workers.

120.    Taken to its logical end, Defendant DOL's reading of the law would make it impossible for a company that needs skilled workers that are in constant short supply to use the H-2B program to address its peak needs. In fact, by DOL's logic, the worse the shortage, the less likely employers are to be able to bring in foreign workers.

121.    Defendant DOL would essentially convert persistent, structural labor shortages into a basis for not awarding H-2B visas. Its decision challenged here effectively nullifies the "peakload"

subcategory. That position cannot be reconciled with the INA or Congress's intent in fashioning the H-2B program

122.    Defendant DOL's position is particularly unfair in the midst of the historic labor shortages across industries around the country caused by the COVID-19 pandemic.

123.    Finally, Defendant DOL's decision here diverges significantly from a previous decision regarding Plaintiff in an extremely similar context. In 2018, Defendant DOL reversed its denial decision on administrative appeal, finding that Plaintiff had indeed established its temporary "peakload" need for H-2B workers caused by Hurricane Harvey, which disrupted offshore drilling operations off the Texas coast. *See Kiewit Offshore Services*, 2018-TLN-00156 (Sept. 20, 2018). Such an unexplained departure from precedent is arbitrary and capricious under the APA.

124.    Defendant DOL denied certification in clear violation of the INA, the regulations implementing the INA, and the APA. Plaintiff's Applications were approvable as filed alongside the detailed evidence that it presented.

125.    Defendant DOL ignored record evidence, made blatant factual and legal errors, and issued a decision unsupported by substantial evidence that diverged from its own history of decision-making concerning Plaintiff.

**Defendants Actions Will Cause Plaintiff Serious and Irreparable Harms**

126.    Defendants' erroneous denial of the Petition has and will continue to cause serious injury to Plaintiff.

127.    Plaintiff's Projects for NFE that mainly consist of converting three drilling rigs into a facility to treat and liquify natural gas at an offshore location is a unique and "one of a kind" project.

128.     Converting each drilling rig requires the building of multiple separate modules, modification of drill rigs to receive these modules, installation of modules onto the drill rigs, hookup (often referred to as integration), and commissioning.

129.     This project contains a significant amount of work for structural fitters, structural welders, pipe fitters, and pipe welders among other tradesmen and craftsmen.

130.     Plaintiff agreed to deliver to NFE these conversions by April 13, 2023, with mechanical completion by March 31, 2023.

131.     To complete the project on schedule, Plaintiff needs, at minimum, additional 150 structural fitters, 50 pipe welder, 125 structural welders, and 125 pipe fitters of workers beyond the craftsmen it currently has on the project.

132.     Plaintiff considers structural fitters, structural welders, pipe fitters, and pipe welders to be core disciplines, which are needed to continue this modification work and not delay project delivery to NFE.

133.     The module fabrication scope is now in an "erection and assembly" phase, which requires all manufactured pieces/subassemblies to be fit together at Plaintiff limiting the ability to mitigate with offsite subcontractor fabrication shops.

134.     In addition to module fabrication scope of work, the three drill rigs require significant modification outfitting that must be completed by Plaintiff and cannot be outsourced to offsite fabrication shops.

135.     Plaintiff cannot subcontract these work scopes to offsite services.

136.     Plaintiff requires the 450 requested craftsmen onsite to complete the module erection and assembly, rig modification scope, and module integration after placing onto the drill rigs.

137.    Plaintiff needs these 450 requested workers as soon as possible to ensure that the project stays on schedule.

138.    Every day Plaintiff fails to onboard these requested 450 workers delays the project delivery further. Plaintiff needs the workers to complete critical structural and process piping assembly and installation.

139.    If Plaintiff fails to onboard these requested 450 workers, a several months, meaningful delay in the delivery of this project can be expected.

**Unworkable Remedies**

140.    Plaintiff is unable to ask its current skilled workers to work additional hours to complete the project because those workers are already working six days a week, and it is unsafe and an unreasonable expectation to have craftsmen work beyond six days per week on a regular or frequent basis with no time off.

141.    Plaintiff cannot reallocate its current workforce to support the NFE Projects without negatively impacting other ongoing projects.

142.    Plaintiff cannot use less skilled workers who are not trained craftsmen as structural fitters, structural welders, pipe welders, and pipe fitters to these Projects without raising the risk of safety incidents or failing to provide satisfactory performance

143.    Plaintiff has attempted to recruit other qualified candidates but has largely been unsuccessful in finding interested and available workers to satisfy the peak need.

144.    Plaintiff knows that there are 150 structural fitters, 50 pipe welder, 125 structural welders, and 125 pipe fitters in Mexico with the necessary experience and skills needed to quickly onboard to the Projects as to not delay the schedule any further.

**Global Impact of Harms & Public Interest of Immediate Relief**

145.   NFE initiated Projects with Plaintiff to obtain LNG and sell it into the global market, which would help reduce the costs of natural gas throughout the world.

146.   The price of natural gas is high and will remain high because of a shortage in Europe resulting from Russia's invasion of Ukraine, which has created issues in obtaining LNG from Russia, one of the world's largest producers of LNG.

147.   Should Plaintiff have to delay the delivery of the convert rigs to LNG due to Plaintiff's inability to on-board the requested 450 workers, NFE would also face delays in providing LNG to market to supply Europe's needs.

148.   A delay of even a few months in Plaintiff's delivery could potentially result in NFE not being able to bring the facility online in time to help curb the natural gas shortage ahead of the cold months beginning in 2023.

149.   Any continued delays in this project will add to the potential suffering of the Europeans who are depending on these alternative sources for LNG since they can no longer rely on Russia to deliver LNG.

150.   Less than a week ago, on October 19, 2022, U.S. President Joe Biden called on the energy industry to engage in robust ramp up in production. Remarks by U.S. President Joseph Biden on Actions to Strengthen Energy Security and Lower Costs, Oct. 19, 2022, *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/10/19/remarks-by-president-biden-on-actions-to-strengthen-energy-security-and-lower-costs/ (last accessed Oct. 21, 2022). Speaking from the White House's Roosevelt Room, President Biden began by explaining: "[e]arlier this year, because of Putin's invasion of Ukraine, the price of oil and gas increased dramatically." *Id.*

151. President Biden made clear that energy independence is a priority of the United States and requires an "all-hands" approach. *Id.*

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION – DEPRIVATION AND VIOLATION OF RIGHTS UNDER THE INA AND IMPLEMENTING REGULATIONS

152. The allegations contained in the preceding paragraphs are repeated and incorporated as though fully set forth herein.

153. Based on the applications for labor certification and accompanying materials, Plaintiff qualified for the labor certification that it sought from Defendants. The Applications and accompanying materials met the stated statutory and regulatory criteria for the H-2B visa category, and Plaintiff provided ample evidence to carry its burden of proof.

154. Defendants' erroneous denial of the Applications violated the INA and its implementing regulations.

155. The denial decision wholly failed to comply with relevant law by erroneously setting aside record evidence, by failing to consider Plaintiff's arguments and evidence, and by impermissibly changing the required standard of proof.

156. As a result, Defendants deprived Plaintiffs of their rights under the INA to seek H-2B visas from USCIS. Plaintiff has the statutory right to benefit from a properly filed labor certification request, and that right has been infringed by unlawful DOL conduct.

## SECOND CAUSE OF ACTION—VIOLATIONS OF APA

157. The allegations contained in the preceding paragraphs are repeated and incorporated as though fully set forth herein.

158. Defendant DOL's denial of Plaintiff's Applications is improper and reviewable under the APA. 5 U.S.C. § 702.

159.    As a result of Defendant DOL's improper decision, Plaintiff is "suffering a legal wrong of agency action," is "adversely affected or aggrieved by agency action," and therefore is "entitled to judicial review thereof." 5 U.S.C. § 702.

160.    Defendant DOL's decision to deny Plaintiff's Applications despite the overwhelming evidence was "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

161.    Defendant DOL failed to engage in reasoned decision making by failing to consider Plaintiff's evidence or to give a valid legal basis for its denial decision. *See generally Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). Defendant DOL failed to properly review and consider all the documents submitted in the applications, NOD responses, and appeal filings. *See id.* at 43 (holding that an agency decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

162.    Defendants' decisions with respect to Plaintiff's Applications are unsupported by substantial evidence as required by the APA. *See* 5 U.S.C. § 706(2)(E). Indeed, the substantial evidence compels Defendants to approve Plaintiff's Applications, but Defendants committed legal error either by failing to consider that evidence at all or by casting aside that evidence without a lawful basis.

163.    Defendant DOL's denial decision instead disregarded substantial record evidence. These factual and legal errors caused Defendant DOL to issue its denial.

164.     Because Defendant DOL breached its duty to Plaintiffs to properly adjudicate the Applications, the APA directs that the "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

### THIRD CAUSE OF ACTION—MANDAMUS ACT

165.     The allegations contained in the preceding paragraphs are repeated and incorporated as though fully set forth herein.

166.     Mandamus lies in the present action because Defendants owe Plaintiff a non-discretionary legal duty to adjudicate the Applications according to applicable law. For the reasons outlined in this Complaint, Defendants failed to comply with that duty.

167.     The Court therefore has authority under the Mandamus Act, 28 U.S.C. § 1361, to compel Defendants to adjudicate the Applications consistent with the duties owed to Plaintiff.

### FOURTH CAUSE OF ACTION—DECLARATORY JUDGMENT ACT

168.     The allegations contained in the preceding paragraphs are repeated and incorporated as though fully set forth herein.

169.     Plaintiff is entitled to a declaration of its rights, which shall have the force and effect of a final judgment, in accordance with 28 U.S.C. § 2201(a).

### PRAYER FOR RELIEF

Plaintiff hereby prays for relief as follows:

1.     That the Court hold unlawful and set aside Defendants' erroneous denial of Plaintiff's Applications as not in accordance with law;

2.     That the Court hold unlawful and set aside Defendants' erroneous evidentiary findings that resulted in the denial decision;

3.      That the Court declare that Plaintiff submitted sufficient evidence to establish that it

is entitled to approval of the Applications;

4.      That the Court compel Defendants to perform their duty owed to Plaintiff by

instructing Defendant DOL to approve the Applications, or in the alternative, directly

granting the Applications; and

5.      That the Court provide further relief as it deems appropriate, just, and equitable.

Respectfully submitted,

Dated: October 26, 2022              By:     /s/ Ryan D. McConnell

**FRAGOMEN, DEL REY,**
**BERNSEN & LOEWY, LLP**

Carl W. Hampe (*pro hac vice* forthcoming)
K. Edward Raleigh (*pro hac vice* forthcoming)*
    *Attorney-in-Charge
Natalie M. Pate (*pro hac vice* forthcoming)
1101 15th Street, N.W., Ste. 700
Washington, DC 20005
Telephone (202) 223-5515
Fax (202) 380 1095
champe@fragomen.com
keraleigh@fragomen.com
npate@fragomen.com

**R. MCCONNELL GROUP, PLLC**

Ryan D. McConnell (TX Bar 24051020)
Lawrence D. Finder (TX Bar 07007200)
Matthew S. Boyden (TX Bar 24113620)
2365 Rice Blvd., Suite 202
Houston, Texas 77005
Phone (713) 224-5775
ryan@rmcconnellgroup.com
larry@rmcconnellgroup.com
matthew@rmcconnellgroup.com

*Attorneys for Plaintiffs*